Presented to the Court by the foreman of the
Grand Jury in open Court, in the presence of
the Grand Jury and FILED in the U.S.
DISTRICT COURT at Seattle, Washington.

December 12 2019

WILLIAM M. McCOOL, Clerk

By _____ Deputy

# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

DENYS IARMAK,
    aka "Denys Olegovich Iarmak,"
    aka "Denys Yarmak,"
    aka "Denis Jarmak,"
    aka "GakTus,"
    aka "denis.jarmak,"

        Defendant.

NO. **CR19-257** RAJ

**INDICTMENT**

The Grand Jury charges that:

## DEFINITIONS

1.    **IP Address**: An Internet Protocol address (or simply "IP address") is a unique numeric address used by devices, such as computers, on the Internet. Every device attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that device may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses.

Indictment / *United States v. Iarmak* - 1

2.    **Server:**  A server is a computer that provides services for other computers connected to it via a network or the Internet.  The computers that use the server's services are sometimes called "clients."  Servers can be physically located anywhere with a network connection that may be reached by the clients; for example, it is not uncommon for a server to be located hundreds (or even thousands) of miles away from the client computers.  A server may be either a physical or virtual machine.  A physical server is a piece of computer hardware configured as a server with its own power source, central processing unit/s and associated software.  A virtual server is typically one of many servers that operate on a single physical server.  Each virtual server shares the hardware resources of the physical server but the data residing on each virtual server is segregated from the data on other virtual servers that reside on the same physical machine.

3.    **Malware**:  Malware is malicious computer code running on a computer. Relative to the owner/authorized user of that computer, malware is computer code that is running on the system that is unauthorized and present on the system without the user's consent.  Malware can be designed to do a variety of things, including logging every keystroke on a computer, stealing financial information or "user credentials" (passwords or usernames), or commanding that computer to become part of a network of "robot" or "bot" computers known as a "botnet."  In addition, malware can be used to transmit data from the infected computer to another destination on the Internet, as identified by an IP address.  Often times, these destination IP addresses are computers controlled by cybercriminals.

4.    **The Carbanak malware**:  "Carbanak" is the name given by computer security researchers to a particular malicious software (malware) program.  Carbanak has been used to remotely access computers without authorization.  The Carbanak malware allows an attacker to spy on another person's computer and remotely control the computer.  Carbanak can record videos of the victim's computer screen and send the recordings back to the attacker.  It can also let the attacker use the victim computer to

1  attack other computers, and to steal files from the victim computer, and install other

2  malware.  All of this can be done without the legitimate user's knowledge or permission.

3       5.  **Bot**:  A "bot" computer is a computer that has been infected with some kind

4  of malicious software or code and is thereafter subject to control by someone other than

5  the true owner.  The true owner of the infected computer usually remains able to use the

6  computer as he did before it was infected, although speed or performance may be

7  compromised.

8       6.  **Botnet**:  A "botnet" is a network of compromised computers known as

9  "bots" that are under the control of a cybercriminal or "bot herder."  The bots are

10  harnessed by the bot herder through the surreptitious installation of malware that provides

11  the bot herder with remote access to, and control of, the compromised computers.  A

12  botnet may be used en masse, in a coordinated fashion, to deliver a variety of Internet-

13  based attacks, including DDoS attacks, brute force password attacks, the transmission of

14  spam emails, the transmission of phishing emails, and hosting communication networks

15  for cybercriminals (e.g., acting as a proxy server for email communications).

16       7.  **Phishing**:  Phishing is a criminal scheme in which the perpetrators use

17  mass email messages and/or fake websites to trick people into providing information such

18  as network credentials (e.g., usernames and passwords) that may later be used to gain

19  access to a victim's systems.  Phishing schemes often utilize social engineering

20  techniques similar to traditional con-artist techniques in order to trick victims into

21  believing they are providing their information to a trusted vendor, customer, or other

22  acquaintance.  Phishing emails are also often used to trick a victim into clicking on

23  documents or links that contain malicious software that will compromise the victim's

24  computer system.

25       8.  **Spear Phishing**:  Spear phishing is a targeted form of phishing directed

26  towards a specific individual, organization or business. Although often intended to steal

27  data for malicious purposes, cybercriminals may also use spear phishing schemes to

28  install malware on a targeted user's computer.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

9.      **Social Engineering**:  Social engineering is a skill developed over time by people who seek to acquire protected information through manipulation of social relationships.  People who are skilled in social engineering can convince key individuals to divulge protected information or access credentials that the social engineer deems valuable to the achievement of his or her aims.

10.     **Pen-Testing:**  Penetration testing, or pen-testing, is the practice of testing a computer system, network or computer application to find vulnerabilities that an attacker may exploit.

## COUNT 1

### (Conspiracy to Commit Wire and Bank Fraud)

**I.      OFFENSE**

11.     The allegations set forth in Paragraphs 1 through 10 and 21 through 25 of this Indictment are re-alleged and incorporated as if fully set forth herein.

12.     Beginning at a time unknown, but no later than September 2015, and continuing through on or after December 12, 2019, at Seattle, within the Western District of Washington, and elsewhere, the defendant, DENYS IARMAK, and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate and agree together to commit offenses against the United States, to wit:

a.      to knowingly and willfully devise and execute and attempt to execute, a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises; and in executing and attempting to execute this scheme and artifice, to knowingly cause to be transmitted in interstate and foreign commerce, by means of wire communication, certain signs, signals and sounds as further described below, in violation of Title 18, United States Code, Section 1343;

b.      to knowingly and willfully devise and execute and attempt to execute, a scheme and artifice to defraud financial institutions, as defined by Title 18,

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   United States Code, Section 20, and to obtain moneys, funds, and credits under the

2   custody and control of the financial institutions by means of materially false and

3   fraudulent pretenses, representations, and promises, in violation of Title 18, United States

4   Code, Section 1344(1) and (2).

5   **II.    OBJECTIVES OF THE CONSPIRACY**

6       13.    The defendant, and others known and unknown to the Grand Jury, were

7   part of a financially motivated cybercriminal conspiracy known variously as FIN7, the

8   Carbanak Group, and the Navigator Group (referred to herein as "FIN7").  FIN7 consists

9   of a group of criminal actors engaged in a sophisticated malware campaign targeting the

10  computer systems of businesses, primarily in the restaurant, gaming, and hospitality

11  industries, among others.

12      14.    The objectives of the conspiracy included hacking into protected computer

13  networks using malicious software (hereinafter, "malware") designed to provide the

14  conspirators with unauthorized access to, and control of, victim computer systems.  The

15  objectives of the conspiracy further included conducting surveillance of victim computer

16  networks, and installing additional malware on victim computer networks for the

17  purposes of establishing persistence, and stealing money and property, including payment

18  card (e.g., credit and debit) track data, financial information, and proprietary and non-

19  public information.  The objectives of the conspiracy further included using and selling

20  the stolen data and information for financial gain in a variety of ways, including, but not

21  limited to, using stolen payment card data to conduct fraudulent transactions across the

22  United States and in foreign countries.

23  **III.   MANNER AND MEANS OF THE CONSPIRACY**

24      15.    The manner and means used to accomplish the conspiracy included the

25  following:

26          a.    FIN7 developed and employed various malware designed to

27  infiltrate, compromise, and gain control of the computer systems of victim companies

28  operating in the United States and elsewhere, including within the Western District of

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Washington.  FIN7 established and operated an infrastructure of servers, located in various countries, through which FIN7 members coordinated activity to further the scheme.  This infrastructure included, but was not limited to, the use of command and control servers, accessed through custom botnet control panels, that communicated with and controlled compromised computer systems of victim companies.

       b.     FIN7 created a front company doing business as Combi Security to facilitate the malware scheme by seeking to make the scheme's illegal conduct appear legitimate.  Combi Security purports to operate as a computer security pen-testing company based in Moscow, Russia and Haifa, Israel.  As part of advertisements and public internet pages for Combi Security, FIN7 portrayed Combi Security as a legitimate penetration testing enterprise that hired itself out to businesses for the purpose of testing their computer security systems.

       c.     Under the guise of a legitimate computer security company, FIN7, doing business as Combi Security, recruited individuals with computer programming skills, falsely claiming that the prospective employees would be engaged in legitimate pen-testing of client computer networks.  In truth and in fact, the defendant and his FIN7 co-conspirators well knew Combi Security was a front company used to hire and deploy hackers who were given tasks in furtherance of the FIN7 conspiracy.

       d.     FIN7 targeted victims in the Western District of Washington, and elsewhere, using phishing techniques to distribute malware designed to gain unauthorized access to, take control of, and exfiltrate data from the computer systems of various businesses.  FIN7 has targeted hundreds of victim companies and brands, including, but not limited to, the following representative victims:

       i.     "Victim-1" referenced herein is the Emerald Queen Hotel and Casino (EQC), a hotel and casino owned and operated by a federally recognized Native American Tribe with locations in Pierce County, within the Western District of Washington.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1           ii.    "Victim-2" referenced herein is a public corporation

2    headquartered in Seattle, within the Western District of Washington, with operations

3    throughout the United States and elsewhere.

4           iii.    "Victim-3" referenced herein is Chipotle Mexican Grill, a

5    U.S.-based restaurant chain with thousands of locations in the United States, including in

6    the Western District of Washington, and in Canada and multiple European countries.

7           iv.    "Victim-4" referenced herein is a U.S.-based pizza parlor

8    chain with hundreds of locations predominantly in the Western United States, including

9    in the Western District of Washington.

10          v.    "Victim-5" referenced herein is BECU, a U.S.-based

11   federally insured credit union headquartered in the Western District of Washington.

12          vi.    "Victim-6" referenced herein is Jason's Deli, a U.S.-based

13   casual delicatessen restaurant chain with hundreds of locations in the United States.

14          vii.    "Victim-7" referenced herein is an automotive retail and

15   repair chain with hundreds of locations in the United States, including in the Western

16   District of Washington.

17          viii.    "Victim-8" referenced herein is Red Robin Gourmet Burgers

18   and Brews (Red Robin), a U.S.-based casual dining restaurant chain, founded in the

19   Western District of Washington, with hundreds of locations in the United States,

20   including in the Western District of Washington.

21          ix.    "Victim-9" referenced herein is Sonic Drive-in (Sonic), a

22   U.S.-based drive-in fast-food chain with thousands of locations in the United States,

23   including in the Western District of Washington.

24          x.    "Victim-10" referenced herein is Taco John's, a U.S.-based

25   fast-food restaurant chain with hundreds of locations in the United States, including in the

26   Western District of Washington.

27         e.    FIN7 typically initiated its attacks by delivering, directly and

28   through intermediaries, a phishing email with an attached malicious file, using wires in

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   interstate and foreign commerce, to an employee of the targeted victim company.  The

2   attached malicious file usually was a Microsoft Word (.doc or .docx), Google Docs, or

3   Rich Text File (.rtf) document with embedded malware.  FIN7 used a variety of malware

4   delivery mechanisms in its phishing attachments including, but not limited to,

5   weaponized Microsoft Word macros, malicious Object Linking and Embedding (OLE)

6   objects, malicious visual basic scripts or JavaScript, and malicious embedded shortcut

7   files (LNK files).  In some instances, the phishing email or attached file contained a link

8   to malware hosted on servers controlled by FIN7.   The phishing email, through false

9   representations and pretenses, fraudulently induced the victim company employee to

10   open the attachment or click on the link to activate the malware.  For example, when

11   targeting a hotel chain, the purported sender of the phishing email might falsely claim to

12   be interested in making a hotel reservation.  By way of further example, when targeting a

13   restaurant chain, the purported sender of the phishing email might falsely claim to be

14   interested in placing a catering order or making a complaint about prior food service at

15   the restaurant.

16              f.       In certain phishing attacks, FIN7, directly and through

17   intermediaries, sent phishing emails to personnel at victim companies who had unique

18   access to internal proprietary and non-public company information, including, but not

19   limited to, employees involved with making filings with the United States Securities and

20   Exchange Commission ("SEC").  These emails used an email address that spoofed an

21   email address associated with the SEC's electronic filing system, and induced the

22   recipients to activate the malware contained in the emails' attachments.

23              g.       In many of the FIN7 attacks, a FIN7 member, or someone hired by

24   FIN7 specifically for such purpose, would also call the victim company, using wires in

25   interstate and foreign commerce, to legitimize the phishing email and convince the victim

26   company employee to open the attached document using social engineering techniques.

27   For example, when targeting a hotel chain or a restaurant chain, a conspirator would

28   make a follow-up call falsely claiming that the details of a reservation request, catering

1  order, or customer complaint could be found in the file attached to the previously

2  delivered email, to induce the employee at the victim company to read the phishing

3  email, open the attached file, and activate the malware.

4          h.      If the recipient activated the phishing email attachment or clicked on

5  the link, the recipient would unwittingly activate the malware, and the computer on

6  which it was opened would become infected and connect to one or more command and

7  control servers controlled by FIN7 to report details of the newly infected computer and

8  download additional malware.  The command and control infrastructure relied upon

9  various servers in multiple countries, including, but not limited to, the United States,

10  typically leased using false information, such as alias names and fictitious information.

11          i.      FIN7 typically would install additional malware, including the

12  Carbanak malware, to connect to additional FIN7 command and control servers to

13  establish remote control of the victim computer.

14          j.      Once a victim's computer was compromised, FIN7 would

15  incorporate the compromised machine or "bot" into a botnet.

16          k.      FIN7 designed and used a custom botnet control panel to manage

17  and issue commands to the compromised machines.

18          l.      Once a victim company's computers were incorporated into the

19  FIN7 botnet and remotely controlled by FIN7's malware, the group used this remote

20  control and access to, among other things, install and manage additional malware,

21  conduct surveillance, map and navigate the compromised computer network, compromise

22  additional computers, exfiltrate files, and send and receive data.  For instance, FIN7 often

23  conducted surveillance on the victim's computer network by, among other things,

24  capturing screen shots and videos of victim computer workstations that provided the

25  conspirators with additional information about the victim company computer network

26  and non-public credentials for both generic company accounts and for actual company

27  employees.

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1           m.     FIN7 used its access to the victim's computer network and

2 information gleaned from surveillance of the victim's computer systems to install

3 additional malware designed to target and extract particular information and property of

4 value, including payment card data and proprietary and non-public information.  For

5 instance, FIN7 often utilized various "off-the-shelf" software and custom malware, and a

6 combination thereof, to extract and transfer data to a "loot" folder on one or more servers

7 controlled by FIN7.

8           n.     FIN7 frequently targeted victim companies with customers who use

9 payment cards while making legitimate point-of-sale (POS) purchases, such as victim

10 companies in the restaurant, gaming, and hospitality industries.  In those cases, FIN7

11 configured malware to extract, copy, and compile the payment card data, and then to

12 transmit the data from the victim computer systems to servers controlled by FIN7.

13           o.     For example, between approximately March 24, 2017, and April 18,

14 2017, FIN7 harvested payment card data from point-of-sale devices at certain Victim-3

15 restaurant locations, including dozens of locations in the Western District of Washington.

16           p.     FIN7 stole millions of payment card numbers, many of which have

17 been offered for sale through vending sites, including, but not limited to, Joker's Stash,

18 thereby attempting to generate millions of dollars of illicit profits.

19           q.     The payment card data were offered for sale to allow purchasers to

20 falsely represent themselves as authorized users of the stolen payment cards and to use

21 the stolen payment card information to purchase goods and services in fraudulent

22 transactions throughout the United States and the world, resulting in millions of dollars in

23 losses to, and thereby affecting, merchants and banks, including financial institutions, as

24 defined in Title 18, United States Code, Section 20.  For example, on or about March 10,

25 2017, stolen payment card data related to accounts held at Victim-5, a financial

26 institution headquartered in the Western District of Washington, compromised through

27 the computer network intrusion of a victim company, was used to make unauthorized

28 purchases at a merchant in Puyallup, Washington.

Indictment / *United States v. Iarmak* - 10

1    r.    FIN7 members employed various techniques to conceal their

2  identities, including simultaneously utilizing various leased servers that had been leased

3  using false subscriber information, in multiple countries.

4    s.    FIN7 operated as a structured enterprise with a hierarchical

5  command structure under which dozens of members with diverse skillsets could

6  coordinate their malicious activity.  Members of the scheme included, but were not

7  limited to:

8    i.    Fedir Hladyr, a systems administrator who, among other

9  things, maintained servers and communication channels used by the organization.  Fedir

10  Hladyr played a leading managerial role by delegating tasks and by providing instruction

11  to other members of the scheme.

12    ii.    Dmytro Fedorov, a high-level "pen-tester" who supervised

13  other hackers specifically tasked with breaching the security of victims' computer

14  systems without the victims' knowledge or consent.

15    iii.    Andrii Kolpakov, a high-level "pen-tester" who supervised

16  other hackers responsible for breaching the security of victims' computer systems

17  without the victims' knowledge or consent.

18    iv.    DENYS IARMAK, a "pen-tester" who was tasked with

19  breaching the security of victims' computer systems without the victims' knowledge or

20  consent.

21    t.    FIN7 members typically communicated with one another and others

22  through private communication channels to further their malicious activity.  Among other

23  channels, FIN7 conspirators communicated using Jabber, an instant messaging service

24  that allows members to communicate across multiple platforms and that supports end-to-

25  end encryption.

26    u.    For example, in Jabber communications with other FIN7 members,

27  Dmytro Fedorov, referenced using malware in connection with several specific victim

28  companies, discussed using the administrative control panels to receive data from

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  compromised computers, and identified several pen-testers working at his direction. By

2  way of further example, in a Jabber communication sent on or about October 26, 2017,

3  DENIS IARMAK provided Fedir Hladyr with internal system information that had been

4  stolen from a victim company, a U.S.-based restaurant chain.

5          v.      FIN7 members often communicated through a private HipChat

6  server. HipChat is a group chat, instant messaging, and file-sharing program. FIN7

7  members used its HipChat server to collaborate on malware and victim business

8  intrusions, to interview potential recruits, and to upload and share exfiltrated data, such as

9  stolen payment card data. As a system administrator, Fedir Hladyr created HipChat user

10  accounts for FIN7 members that allowed them to access the server.

11          w.      Fedir Hladyr also created and participated in multiple HipChat

12  "rooms" with other FIN7 members and participated in the uploading and organization of

13  stolen payment card data and malware. For example, on or about March 14, 2016, Fedir

14  Hladyr uploaded an archive that contained numerous data files created by malware

15  designed to steal data from point-of-sale systems that process payment cards. The files

16  contained payment card numbers stolen from a victim company that had publicly

17  reported a security breach that resulted in the compromise of tens of thousands of

18  payment cards. By way of further example, Fedir Hladyr also set up and used a HipChat

19  room titled "MyFile", in which he was the only participant, and to which he uploaded

20  malware used by FIN7 and stolen payment card information.

21          x.      FIN7 conspirators used numerous email accounts hosted by a variety

22  of providers in the United States and elsewhere, which they often registered using false

23  subscriber information.

24          y.      FIN7 conspirators frequently used the project management software

25  JIRA, hosted on private virtual servers in various countries, to coordinate their malicious

26  activity and to manage the assorted network intrusions. JIRA is a project management

27  and issue-tracking program used by software development teams. FIN7 members

28  typically created a "project" on the virtual JIRA server and then associated "issues" with

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  the project, each issue akin to an issue directory or folder, for a victim company, which

2  they used to collaborate and share details of the intrusion, to post victim company

3  intelligence, such as network mapping information, and to store and share exfiltrated

4  data.

5          z.      For example, on about September 7, 2016, Fedir Hladyr created an

6  "issue" for Victim-6, to which FIN7 conspirators including Andreii Kolpakov posted files

7  containing internal credentials for the victim company's computer network.

8          aa.     By way of further example, on multiple occasions in January 2017,

9  Dmytro Fedorov and another FIN7 member posted to the FIN7 "issue" created for

10 Victim-7, information about the victim company's internal network and uploaded

11 exfiltrated data, including stolen employee credentials.  Similarly, on or about April 5,

12 2017, Dmytro Fedorov created an "issue" for another victim company, Victim-9, and

13 uploaded stolen user credentials from the victim company.  DENIS IARMAK had access

14 to approximately 25 JIRA issues on one FIN7 server, and approximately 20 JIRA issues

15 on another FIN7 server.

16         bb.     FIN7 conspirators knew that the scheme would involve the use of

17 wires in both interstate and foreign commerce to accomplish the objectives of the

18 scheme.  For example, each defendant and his FIN7 co-conspirators knew that execution

19 of the scheme necessarily caused the transmission of wire communications between the

20 United States and one or more servers controlled by FIN7 located in foreign countries.

21        All in violation of Title 18, United States Code, Section 1349.

22

23                          **COUNTS 2 - 15**

24                          **(Wire Fraud)**

25        16.     The allegations set forth in Paragraphs 1 through 15 of this Indictment are

26 re-alleged and incorporated as if fully set forth herein.

27

28

Indictment / *United States v. Iarmak* - 13

**I.      SCHEME AND ARTIFICE TO DEFRAUD**

17.     Beginning at a time unknown, but no later than September 2015, and continuing through on or after December 12, 2019, at Seattle, within the Western District of Washington, and elsewhere, the defendant, DENYS IARMAK, and others known and unknown to the Grand Jury, devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

18.     The essence of the scheme and artifice to defraud was to obtain unauthorized access into, and control of, the computer networks of victims through deceit and materially false and fraudulent pretenses and representations, through the installation and use of malware designed to facilitate, among other things, the installation of additional malware, the sending and receiving of data, and the surveillance of the victims' computer networks.  The object of the scheme and artifice to defraud was to steal money and property of value, including payment card data and proprietary and non-public information, which was, and could have been, sold and used for financial gain.

**II.     MANNER AND MEANS OF SCHEME TO DEFRAUD**

19.     The manner and means of the scheme and artifice to defraud are set forth in Paragraph 15 of Count 1 of this Indictment.

**III.    EXECUTION OF SCHEME TO DEFRAUD**

20.     On or about the dates set forth below, within the Western District of Washington, and elsewhere, the defendant, and others known and unknown to the Grand Jury, having devised a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did knowingly transmit and cause to be transmitted writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme, by means of wire communication in interstate and foreign commerce, including the following transmissions:

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| Count | Date(s) | Victim/Location | Wire Communication |
|---|---|---|---|
| 2 | August 8, 2016 | Victim-1 Pierce County | Email from just_etravel@yahoo.com, which traveled through a server located outside the State of Washington, to a Victim-1 employee, located within the State of Washington |
| 3 | August 8, 2016 | Victim-1 Pierce County | Email from frankjohnson@revital-travel.com, which traveled through a server located outside the State of Washington, to a Victim-1 employee, located within the State of Washington |
| 4 | August 8, 2016 | Victim-1 Pierce County | Electronic communication between a server located outside the State of Washington, and Victim-1's computer system, located within the State of Washington |
| 5 | February 21, 2017 | Victim-2 Seattle | Email purporting to be from a government account, which traveled through a server located outside the State of Washington, to a Victim-2 employee, located within the State of Washington |
| 6 | February 23, 2017 | Victim-2 Seattle | Electronic communication between a server located outside the State of Washington, and Victim-2's computer system, located within the State of Washington |
| 7 | March 24, 2017 | Victim-3 4120 196th St SW, Suite 150, Lynnwood | Electronic communication between a server, located outside the State of Washington, and Victim-3's computer system, located within the State of Washington |
| 8 | March 25, 2017 | Victim-3 1415 Broadway, Seattle | Electronic communication between a server, located outside the State of Washington, and Victim-3's computer system, located within the State of Washington |
| 9 | March 25, 2017 | Victim-3 800 156th Ave NE, Bellevue | Electronic communication between a server, located outside the State of Washington, and Victim-3's computer |

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

| Count | Date(s) | Victim/Location | Wire Communication |
|-------|---------|-----------------|--------------------|
| | | | system, located within the State of Washington |
| 10 | March 25, 2017 | Victim-3<br>4 Bellis Fair Pkwy, Bellingham | Electronic communication between a server, located outside the State of Washington, and Victim-3's computer system, located within the State of Washington |
| 11 | March 25, 2017 | Victim-3<br>775 NW Gilman Blvd, Suite A, Issaquah | Electronic communication between a server, located outside the State of Washington, and Victim-3's computer system, located within the State of Washington |
| 12 | March 27, 2017 | Victim-3<br>515 SE Everett Mall Way, Suite B, Everett | Electronic communication between a server, located outside the State of Washington, and Victim-3's computer system, located within the State of Washington |
| 13 | April 11, 2017 | Victim-3<br>22704 SE 4th St, Suite 210, Sammamish | Electronic communication between a server, located outside the State of Washington, and Victim-3's computer system, located within the State of Washington |
| 14 | April 11, 2017 | Victim-4<br>Renton | Email from oliver_palmer@yahoo.com, which traveled through a server located outside the State of Washington, to a Victim-4 employee, located within the State of Washington |
| 15 | March 10, 2017 | Victim-5<br>Puyallup | Electronic communication between a merchant, located within the State of Washington, and a payment processor server, located outside the State of Washington |

All in violation of Title 18, United States Code, Section 1343.

Indictment / *United States v. Iarmak* - 16

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## COUNT 16

### (Conspiracy to Commit Computer Hacking)

21.     The allegations set forth in Paragraphs 1 through 20 of this Indictment are re-alleged and incorporated as if fully set forth herein.

**I.     OFFENSE**

22.     Beginning at a time unknown, but no later than September 2015, and continuing through on or after December 12, 2019, at Seattle, within the Western District of Washington, and elsewhere, the defendant, DENYS IARMAK, and others known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate and agree together to commit offenses against the United States, to wit:

      a.     to knowingly and with intent to defraud, access a protected computer without authorization and exceed authorized access to a protected computer, and by means of such conduct further the intended fraud and obtain anything of value exceeding $5,000.00 in any 1-year period, in violation of Title 18, United States Code, Sections 1030(a)(4) and (c)(3)(A); and

      b.     to knowingly cause the transmission of a program, information, code, and command, and as a result of such conduct, intentionally cause damage without authorization to a protected computer, and cause loss to one or more persons during a 1-year period aggregating at least $5,000.00 in value and damage affecting 10 or more protected computers during a 1-year period, in violation of Title 18, United States Code, Sections 1030(a)(5)(A) and (c)(4)(B)(i).

**II.     OBJECTIVES OF THE CONSPIRACY**

23.     The objectives of the conspiracy included hacking into protected computer networks using malware designed to provide the conspirators with unauthorized access to, and control of, victim computer systems.  The objectives of the conspiracy further included conducting surveillance of victim computer networks and installing additional malware on the victim computer networks for the purposes of establishing persistence, and stealing payment card track data, financial information, and proprietary, private, and

Indictment / *United States v. Iarmak* - 17

1  non-public information, with the intention of using and selling such stolen items, either

2  directly or indirectly, for financial gain.  The objectives of the conspiracy further

3  included installing malware that would integrate victim computers into a botnet that

4  allowed the conspiracy to control, alter, and damage compromised computers.

5  **III.    MANNER AND MEANS OF THE CONSPIRACY**

6       24.    The manner and means used to accomplish the conspiracy are set forth in

7  Paragraph 15 of Count 1 of this Indictment.

8  **IV.    OVERT ACTS**

9       25.    In furtherance of the conspiracy, and to achieve the objects thereof, the

10  defendant, and others known and unknown to the Grand Jury, did commit and cause to be

11  committed, the following overt acts, among others, in the Western District of Washington

12  and elsewhere:

**Representative Channels of Communication**

*Virtual Servers*

15       a.    As part of its command and control infrastructure, FIN7 used a

16  number of physical servers in different countries to host virtual communication servers.

17  In addition to other channels of communication, FIN7 members used virtual HipChat,

18  JIRA, and Jabber servers to collaborate and coordinate their attacks.

Hip Chat

20       i.    FIN7 utilized a virtual HipChat Server for a variety of

21  purposes, including, but not limited to, interviewing prospective members, collaborating

22  on attacks against victim companies, and sharing malware and exfiltrated data.  Among

23  other communications made in furtherance of the conspiracy:

24       1.    In 2016, Fedir Hladyr created a private HipChat room

25  for communications with a leader of the conspiracy and subsequently uploaded data

26  stolen from victim companies.

27       2.    On or about March 14, 2016, Fedir Hladyr uploaded an

28  archive to his private HipChat room with a leader of the conspiracy that contained

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  numerous data files containing payment card numbers stolen from a victim company that

2  had publicly reported a security breach involving the loss of tens of thousands of payment

3  cards.

4          3.      On or about February 1, 2016, a member of the

5  conspiracy uploaded a file named "track_dumper_micros" to a HipChat room.

6          4.      On or about February 6, 2016, in a HipChat room

7  titled "collection" that was accessed by Fedir Hladyr, and others, a FIN7 member

8  uploaded a file named "tracksDecodingPHP."

9          5.      On or about March 7, 2017, a FIN7 member uploaded

10  files containing VBS script-based malware code into a HipChat room.

11          6.      On or about April 8, 2016, Fedir Hladyr created a

12  HipChat room called "My_Files," to which he had exclusive access, and to which he later

13  uploaded data for approximately 100 stolen payment cards and network maps of internal

14  network infrastructures.

15          7.      On or about July 19, 2016, Fedir Hladyr posted in a

16  HipChat room, files related to a victim company, including multiple screenshots from one

17  or more compromised computers that showed, among other things, internal company

18  information and an administrator password.

19          8.      On or about March 6, 2017, in a HipChat room, a

20  FIN7 member described FIN7's misuse of Google services to harvest information from

21  victim computers, disseminate malware, and perform additional malicious activities.

<u>JIRA</u>

23          ii.     As explained in Paragraph 15.y, FIN7 used virtual JIRA

24  servers to coordinate their malicious activity and to exchange files.  Among other

25  communications made in furtherance of the conspiracy:

26          1.      On or about January 17, 2017, a FIN7 member created

27  an issue and uploaded PowerShell scripts design to capture and exfiltrate non-public

28  network information from victim computers.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1                     2.      On or about February 20, 2017, a FIN7 member

2   created an issue in which he outlined how to use Meterpreter to allow FIN7 to access and

3   control a victim computer.

4                     3.      On or about March 3, 2017, a FIN7 member created an

5   issue regarding a malicious PowerShell script designed to steal passwords from victim

6   companies while avoiding detection by anti-virus software.

7                     4.      On or about March 3, 2017, DENYS IARMAK

8   updated a JIRA issue he had created for a specific victim company and uploaded data he

9   had stolen from that U.S. company.

10   <u>Jabber</u>

11          iii.     FIN7 maintained a virtual Jabber server through which

12   members could communicate privately.  Among other Jabber communications made in

13   furtherance of the conspiracy:

14                     1.      On or about April 14, 2016, a FIN7 member informed

15   Andrii Kolpakov that Fedir Hladyr and another individual were the "main" directors of

16   the group.

17                     2.      On or about August 1, 2016, a FIN7 member directed

18   Dmytro Fedorov to target victim machines that ran MICROS point-of-sale software.

19                     3.      On or about December 7, 2016, a FIN7 member

20   directed another member of the conspiracy to develop the ability to misuse Google

21   services to launch malicious JavaScript scripts.

22                     4.      On or about January 12, 2017, a FIN7 member

23   introduced himself to a new FIN7 recruit, explained how the member's salary would be

24   paid, and indicated that Andrii Kolpakov would be his supervisor.

25                     5.      On or about March 2, 2017, a FIN7 member provided

26   technical guidance to Dmytro Fedorov regarding a botnet control panel and asked

27   Dmytro Fedorov to identify hackers who were under Dmytro Fedorov's supervision.

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1       6.     On or about February 6 and 7, 2017, a FIN7 member

2 and Fedir Hladyr discussed one of the malware programs that FIN7 used to dump credit

3 cards from victims' networks and saved the stolen credit card dumps into a particular file.

4       7.     On or about April 28, 2017, DENYS IARMAK and

5 Dmytro Fedorov discussed the creation and use of phishing emails.

6       8.     On or about May 31, 2017, a FIN7 member and Fedir

7 Hladyr discussed the possible detection of FIN7 malware installed on point-of-sale (POS)

8 terminals at a U.S.-based casual seafood restaurant chain.

9       9.     On or about June 22, 2017, DENYS IARMAK

10 informed Dmytro Fedorov that one of FIN7's malware tools had been "burned" because

11 it was detectable by antivirus software.

12       10.     On July 24, 2017, DENYS IARMAK exchanged

13 stolen victim information with Fedir Hladyr.

14       11.     Between on or about August 7, 2017 and August 29,

15 2017, a FIN7 member and Fedir Hladyr discussed compromising point-of-sale systems

16 and intrusions related to known U.S. victim companies, including a franchise

17 management company that operates servers for a nation-wide restaurant chain.

18       12.     On or about August 15, 2017, a FIN7 member and

19 Fedir Hladyr discussed the dissemination of phishing emails.

20       13.     On or about October 19, 2017, Fedir Hladyr sent a

21 FIN7 member victim payment card information and the recipient confirmed that the

22 payment cards were valid.

23       14.     On or about October 26, 2017, DENYS IARMAK

24 provided Fedir Hladyr information about a computer belonging to a victim, a U.S.

25 restaurant chain that was breached by FIN7.

26                             *Email Communications*

27       b.     FIN7 members also communicated regularly by email.  Among other

28 communications made in furtherance of the conspiracy:

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

i.      On or about September 29, 2015, a FIN7 member sent an email containing code for a VBS script.

ii.     On or about May 25, 2016, a FIN7 member sent a phishing email to another member of FIN7.

iii.    On or about September 13, 2016, a FIN7 member sent an email with an attachment containing a malicious PHP script to another FIN7 member.

iv.     On or about November 1, 2016, a FIN7 member sent an email with the text of a phishing email and an attached Microsoft Word document containing malware.

v.      On or about November 1, 2016, Fedir Hladyr sent an email to a FIN7 member with access information for FIN7's private Jabber server.

vi.     On or about April 13, 2017, DENIS IARMAK sent another FIN7 member an email related to his efforts to use commercial antivirus software to test whether FIN7's malware tools would be detected by the antivirus software.

vii.    On or about September 20, 2017, a FIN7 member emailed malware to another member of the conspiracy that contained a malicious script designed to take screenshots of victims' computers.

**Victim-1**

c.      The conspiracy compromised, illegally accessed, had unauthorized communications with, and exfiltrated proprietary, private, and non-public victim data and information from the computer systems of Victim-1, a hotel and casino in the Western District of Washington.  For instance,

i.      On or about August 8, 2016, the conspiracy, directly and through intermediaries, used the account just_etravel@yahoo.com to send a phishing email, with the subject "order," to an employee of Victim-1 located in Tacoma, Washington, with an attached Microsoft Word document that contained malware.  The email contained materially false representations designed to induce the targeted employee to open enable the malware, and compromise the computer system.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

ii.     On or about August 8, 2016, the conspiracy, directly and through intermediaries, used the account frankjohnson@revital-travel.com to send a phishing email, with the subject "order," to an employee of Victim-1 located in Tacoma, Washington, with an attached Microsoft Word document that contained malware.  The email contained materially false representations designed to induce the targeted employee to enable the malware, and compromise the computer system.

iii.    Under the control of the conspiracy's malware, a compromised computer of Victim-1 communicated with a command and control server located in a foreign country.  For instance, from August 8, 2016, to August 9, 2016, and from August 24, 2016 to August 31, 2016, a compromised Victim-1 computer logged approximately 3,639 communications with various URLs all starting with "revital-travel.com" at an IP address hosted in Russia.

**Victim-2**

d.     The conspiracy compromised, illegally accessed, had unauthorized communications with, and exfiltrated proprietary, private, and non-public victim data and information from the computer systems of Victim-2, a corporation headquartered in Seattle, Washington.  For instance,

i.     On or about February 21, 2017, the conspiracy, directly and through intermediaries, used an account purporting to be filings@sec.gov (but that actually was sent by secureserver.net) to send a phishing email to an employee of Victim-2 located in Seattle, Washington, with an attached Microsoft Word document that contained malware.  The email falsely purported to relate to a corporate filing with the SEC and contained materially false representations designed to induce the targeted employee to open the file, enable the malware, and compromise the computer system.

ii.     From on or about February 21, 2017, to approximately March 3, 2017, the conspiracy illegally accessed and had communications with the computer systems of Victim-2 located in Seattle, Washington.  For instance, between about February 23, 2017, and February 24, 2017, the victim computer made outgoing

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 connections to and transferred internal data, without authorization, to an IP address
2 located in a foreign country.

3                 iii.      On or about February 24, 2017, a FIN7 member posted to a
4 JIRA "issue" created for Victim-2, a screenshot from the targeted employee's computer
5 at Victim-2, which showed, among other things, an internal Victim-2 webpage available
6 only to employees with a valid user account.

7                 iv.      Similarly, a FIN7 member posted to the Victim-2 JIRA
8 "issue" a text file containing the usernames and passwords of the targeted Victim-2
9 employee, including his/her personal email account, LinkedIn account, and personal
10 investment and financial institution accounts.

**Victim-3**

12         e.      The conspiracy compromised, illegally accessed, had unauthorized
13 communications with, and exfiltrated proprietary, private, and non-public victim data and
14 information from the computer systems of Victim-3, a restaurant chain with thousands of
15 locations, including the State of Washington.  From approximately March 24, 2017 to
16 April 18, 2017, the conspiracy accessed computer systems of Victim-3 and implanted
17 malware designed to harvest payment card data from cards used on point-of-sale devices
18 at restaurant locations nationwide, including approximately 33 locations within the
19 Western District of Washington.

**Victim-4**

21         f.      The conspiracy compromised, illegally accessed, had unauthorized
22 communications with, and exfiltrated proprietary, private, and non-public victim data and
23 information from the computer systems of one or more locations of Victim-4, a pizza
24 parlor chain with hundreds of locations, including in Washington.  For instance,

25                 i.      On or about April 11, 2017, the conspiracy, directly and
26 through intermediaries, used the account oliver_palmer@yahoo.com, to send a phishing
27 email, with the subject "claim," to an employee of a Victim-4 located in Renton,
28 Washington, with an attached Rich Text Format (.rtf) document that contained malware.

Indictment / *United States v. Iarmak* - 24

1  The email falsely purported to convey a customer complaint and contained additional

2  materially false representations designed to induce the targeted employee to enable the

3  malware, and compromise the computer system.

4          ii.     On or about April 11, 2017, the conspiracy, directly and

5  through intermediaries, used the account oliver_palmer@yahoo.com, to send a phishing

6  email, with the subject "claim," to an employee of a Victim-4 located in Vancouver,

7  Washington, with an attached Rich Text Format (.rtf) document that contained malware.

8  The email falsely purported to convey a customer complaint and contained additional

9  materially false representations designed to induce the targeted employee to enable the

10  malware, and compromise the computer system.

11          iii.    On or about May 25, 2017, the conspiracy, directly and

12  through intermediaries, used the account Adrian.1987clark@yahoo.com, to send a

13  phishing email, with the subject "takeout order," to an employee of a Victim-4 located in

14  or around Spokane, Washington, with an attached Rich Text Format (.rtf) document that

15  contained malware.  The email falsely stated that the sender had a large takeout order and

16  contained additional materially false representations designed to induce the targeted

17  employee to enable the malware, and compromise the computer system.

18  **Victim-6**

19          g.     The conspiracy compromised, illegally accessed, had unauthorized

20  communications with, and exfiltrated proprietary, private, and non-public victim data and

21  information from the computer systems of Victim-6, a restaurant chain with locations in

22  multiple states.  For instance,

23          i.     On or about August 25, 2016, the conspiracy, directly and

24  through intermediaries, used the account revital.trave1@yahoo.com to send a phishing

25  email to an employee of Victim-6, with an attached Microsoft Word document that

26  contained malware.  The email contained materially false representations designed to

27  induce the targeted employee to enable the malware, and compromise the computer

28  system.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    ii.    On or about September 7, 2016, Fedir Hladyr created an

2  "issue" on the conspiracy's private JIRA server specifically related to Victim-6, to which

3  Andrii Kolpakov subsequently uploaded comments and stolen information pertaining to

4  Victim-6's network structure and administrative credentials.

5    iii.    On or about May 29, 2017, a FIN7 member and Fedir Hladyr

6  discussed an issue with FIN7 command and control servers associated with the

7  compromise of Victim-6.

8                                    **Victim-7**

9    h.    The conspiracy compromised, illegally accessed, had unauthorized

10  communications with, and exfiltrated proprietary, private, and non-public victim data and

11  information from the computer systems of Victim-7, an automotive retail and repair chain

12  with hundreds of locations in multiple states, including Washington.  For instance,

13    i.    On or about January 18, 2017, a FIN7 member created an

14  "issue" on the conspiracy's private JIRA server specifically related to Victim-7, to which

15  that individual and Dmytro Fedorov subsequently posted results from several network

16  mapping tools used on Victim-7's internal network.

17    ii.    On or about January 20, 2017, a FIN7 member posted

18  exfiltrated data, including multiple usernames and passwords with the title "Server

19  Passwords," to the Victim-7 JIRA "issue."

20    iii.    On or about January 23, and January 24, 2017, Dmytro

21  Fedorov posted information about Victim-7's internal network and uploaded a file

22  containing multiple IP addresses and information about Victim-7's servers to the Victim-

23  7 JIRA "issue."

24    iv.    On or about January 27, 2017, Dmytro Fedorov uploaded to

25  the Victim-7 JIRA "issue" a file containing over 1,000 usernames and passwords for

26  generic company accounts and employee accounts.  The potentially compromised

27  accounts related to approximately 700 Victim-7 locations throughout the United States,

28  including approximately 12 locations located in the state of Washington.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    On or about February 9, 2017, a FIN7 member created an "issue" on the

2  conspiracy's private JIRA server specifically related to Victim-7, which was assigned to

3  DENYS IARMAK.

4                                    **Victim-8**

5    i.    The conspiracy compromised, illegally accessed, had unauthorized

6  communications with, and exfiltrated proprietary, private, and non-public victim data and

7  information from the computer systems of Victim-8, a restaurant chain with hundreds of

8  locations in multiple states, including Washington.  For instance,

9    i.    On or about March 27, 2017, the conspiracy, directly and

10 through intermediaries, used the account ray.donovan84@yahoo.com, to send a phishing

11 email to a Victim-8 employee, with an attached Microsoft Word document that contained

12 malware.  The email falsely purported to convey a customer order and contained

13 additional materially false representations designed to induce the targeted employee to

14 enable the malware, and compromise the computer system.

15    ii.    On or about March 29, 2017, a FIN7 member created an

16 "issue" on the conspiracy's private JIRA server specifically related to Victim-8 and

17 posted results from several network mapping tools used on Victim-8's internal network.

18    iii.    On or about March 31, 2017, a FIN7 member posted a link to

19 the point-of-sale software management solution used by Victim-8, and a username and

20 password to the Victim-8 JIRA "issue."  The software management tool allows a

21 company to manage point-of-sale systems at multiple locations.  The FIN7 member also

22 uploaded several screenshots presumably from one or more victim computers at Victim-

23 8, which showed, among other things, the user logged into Victim-8's account for the

24 software management tool.

25    iv.    On or about April 6, 2017, a FIN7 member uploaded to the

26 Victim-8 JIRA "issue" a file containing hundreds of usernames and passwords for

27 approximately 798 Victim-8 locations, including 37 locations located in the State of

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 Washington. The file included network information, telephone communications, and
2 locations of alarm panels within restaurants.

3                 v.     On or about April 7, 2017, a FIN7 member uploaded to the
4 Victim-8 JIRA "issue" a similar file containing numerous usernames and passwords for
5 Victim-8 locations.

6               vi.     On or about May 5, 2017, a FIN7 member uploaded to the
7 Victim-8 JIRA "issue" a file containing file directories on a compromised computer.

8              vii.    On or about May 8, 2017, a FIN7 member uploaded to the
9 Victim-8 JIRA "issue" exfiltrated files related to a password management system from a
10 compromised computer, which contained the credentials, usernames, and passwords of a
11 particular employee.

12             viii.   On or about May 15, 2017, a FIN7 member uploaded to the
13 Victim-8 JIRA "issue" screenshots of a compromised computer that showed the
14 employee accessing Victim-8's security infrastructure management software using that
15 same employee's credentials.

16              ix.     On or about May 16, 2017, a member of the conspiracy and
17 Fedir Hladyr discussed through Jabber a particular server used in the intrusion of
18 Victim-8.

19                        **Victim-9**

20          j.     The conspiracy compromised, illegally accessed, had unauthorized
21 communications with, and exfiltrated proprietary, private, and non-public victim data and
22 information from the computer systems of one or more locations of Victim-9, a fast-food
23 restaurant chain with thousands of locations throughout the United States, including
24 Washington. For instance,

25              i.     The conspiracy, directly and through intermediaries, sent
26 phishing emails with an attached file that contained malware to multiple Victim-9
27 locations. For instance, on or about April 7, 2017, the conspiracy used the account
28 oliver_palmer@yahoo.com to send a phishing email to a Victim-9 location in the State of

1  Oregon.  The email contained materially false representations designed to induce the

2  targeted employee to open the file, enable the malware, and compromise the computer

3  system.

4          ii.      On or about April 5, 2017, Dmytro Fedorov created an

5  "issue" on the conspiracy's private JIRA server specifically related to Victim-9 to which

6  one or more FIN7 members subsequently posted usernames and passwords for Victim-9

7  locations, including a Victim-9 location in Vancouver, Washington.

8  **Victim-10**

9          k.      The conspiracy compromised, illegally accessed, had unauthorized

10  communications with, and exfiltrated proprietary, private, and non-public victim data and

11  information from the computer systems of one or more locations of Victim-10, a fast-

12  food restaurant chain with hundreds of locations in various states, including Washington.

13  For instance,

14          i.      On or about May 24, 2017, a FIN7 member created an "issue"

15  on the conspiracy's private JIRA server specifically related to Victim-10, to which other

16  FIN7 members subsequently posted information relating to the intrusion of computer

17  systems and exfiltrated data, including files containing passwords and screenshots from

18  one or more compromised computers.

19          ii.      On or about June 12, 2017, the conspiracy, directly and

20  through intermediaries, used the account Adrian.1987clark@yahoo.com, to send a

21  phishing email, with the subject "order.catering," to an employee of a Victim-10 located

22  in Iowa, with an attached Rich Text Format (.rtf) document that contained malware.  The

23  email falsely stated that the sender had a catering order for the following day and

24  contained additional materially false representations designed to induce the employee to

25  enable the malware, and compromise the computer system.

26          iii.      From on or about June 12, 2017, to a date unknown, the

27  conspiracy illegally accessed and had communications with the computer systems of

28  Victim-10 located in Iowa.  For instance, the conspiracy transferred, without

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  authorization, proprietary, private, and non-public victim data and information, including

2  usernames and passwords, to a JIRA server managed by FIN7, located in a foreign

3  country.

4          iv.    On or about June 13, 2017, , a FIN7 member created an

5  "issue" on the conspiracy's private JIRA server specifically related to Victim-10, which

6  was assigned to DENYS IARMAK.

7          v.    On or about June 14, 2017, a FIN7 member uploaded a

8  variety of information including recommendations for attack vectors FIN7 members

9  could use to access Victim-10's internal network.

10      All in violation of Title 18, United States Code, Section 371.

11

12  ## COUNTS 17 - 19

13  ### (Accessing a Protected Computer in Furtherance of Fraud)

14      26.    The allegations set forth in Paragraphs 1 through 25 of this Indictment are

15  re-alleged and incorporated as if fully set forth herein.

16      27.    On or about the dates listed below, within the Western District of

17  Washington, and elsewhere, the defendant, DENYS IARMAK, and others known and

18  unknown to the Grand Jury, knowingly and with intent to defraud accessed a protected

19  computer without authorization and in excess of authorized access, and by means of such

20  conduct furthered the intended fraud and obtained something of value, specifically,

21  payment card data and proprietary and non-public information, whereby the object of the

22  fraud and the thing obtained consisted of more than the use of the computers and the

23  value of such use was more than $5,000 in a 1-year period, as listed below:

| Count | Dates | Victim |
|-------|-------|--------|
| 17 | August 8, 2016 through October 4, 2016 | Victim-1 |
| 18 | February 21, 2017 through March 3, 2017 | Victim-2 |
| 19 | March 24, 2017 through April 18, 2017 | Victim-3 |

27      All in violation of Title 18, United States Code, Sections 1030(a)(4), 1030(b),

28  1030(c)(3)(A) and 2.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## COUNTS 20 - 22

### (Intentional Damage to a Protected Computer)

28.     The allegations set forth in Paragraphs 1 through 27 of this Indictment are re-alleged and incorporated as if fully set forth herein.

29.     On or about the dates listed below, within the Western District of Washington, and elsewhere, the defendant, DENYS IARMAK, and others known and unknown to the Grand Jury, knowingly caused the transmission of a program, information, code, and command, and as a result of such conduct, intentionally caused damage without authorization, to a protected computer, specifically, the protected computer system of the victim listed below, and the offense caused (i) loss to one or more persons during a 1-year period aggregating at least $5,000.00 in value and (ii) damage affecting 10 or more protected computers during a 1-year period:

| Count | Dates | Victim |
|-------|-------|--------|
| 20 | August 8, 2016 through October 4, 2016 | Victim-1 |
| 21 | February 21, 2017 through March 3, 2017 | Victim-2 |
| 22 | March 24, 2017 through April 18, 2017 | Victim-3 |

All in violation of Title 18, United States Code, Sections 1030(a)(5)(A), 1030(b), 1030(c)(4)(B), and 2.

## COUNT 23

### (Access Device Fraud)

30.     The allegations set forth in Paragraphs 1 through 29 of this Indictment are re-alleged and incorporated as if fully set forth herein.

31.     Beginning at a time unknown, and continuing through on or after June 20, 2018, within the Western District of Washington, and elsewhere, the defendant, DENYS IARMAK, and others known and unknown to the Grand Jury, knowingly and with intent to defraud, possessed fifteen or more counterfeit and unauthorized access devices, namely, payment card data, account numbers, and other means of account access that can be used, alone and in conjunction with another access device, to obtain money, goods,

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   services, and any other thing of value, and that can be used to initiate a transfer of funds;

2   said activity affecting interstate and foreign commerce

3        All in violation of Title 18, United States Code, Sections 1029(a)(3), 1029(b)(1),

4   1029(c)(1)(A), and 2.

5

6   **COUNT 24**

7   **(Aggravated Identity Theft)**

8        **32.**    The allegations set forth in Paragraphs 1 through 31 of this Indictment are

9   re-alleged and incorporated as if fully set forth herein.

10       **33.**    Beginning at a time unknown, but no earlier than on or about February 21,

11  2017, and no later than March 3, 2017, and continuing through on or after November 21,

12  2017, at Seattle, within the Western District of Washington, and elsewhere, the

13  defendant, DENYS IARMAK, and others known and unknown to the Grand Jury, did

14  knowingly transfer, possess, and use, without lawful authority, a means of identification

15  of another person, to wit: the name, username, and password of a real person, J.Q., an

16  employee of Victim-2, during and in relation to a felony violation enumerated in 18

17  U.S.C. § 1028A(c), that is, conspiracy to commit wire and bank fraud, in violation of 18

18  U.S.C. § 1349, as charged in Count 1, and wire fraud, in violation of 18 U.S.C. § 1343, as

19  charged in Counts 5 and 6, knowing that the means of identification belonged to another

20  actual person.

21       All in violation of Title 18, United States Code, Sections 1028A(a) and 2.

22

23  **COUNT 25**

24  **(Aggravated Identity Theft)**

25       **34.**    The allegations set forth in Paragraphs 1 through 33 of this Indictment are

26  re-alleged and incorporated as if fully set forth herein.

27       **35.**    Beginning at a time unknown, but no later than on or about May 8, 2017,

28  and continuing through on or after November 21, 2017, within the Western District of

Indictment / *United States v. Iarmak* - 32

Washington, and elsewhere, the defendant, DENYS IARMAK, and others known and unknown to the Grand Jury, did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, to wit: the name, employee credentials, username, and password of a real person, N.M., an employee of Victim-8, during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), that is, conspiracy to commit wire and bank fraud, in violation of 18 U.S.C. § 1349, as charged in Count 1, knowing that the means of identification belonged to another actual person.

All in violation of Title 18, United States Code, Sections 1028A(a) and 2.

## COUNT 26

### (Aggravated Identity Theft)

36.     The allegations set forth in Paragraphs 1 through 35 of this Indictment are re-alleged and incorporated as if fully set forth herein.

37.     Beginning at a time unknown, but no later than on or about January 27, 2017, and continuing through on or after November 21, 2017, within the Western District of Washington, and elsewhere, the defendant, DENYS IARMAK, and others known and unknown to the Grand Jury, did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, to wit: the name, username, and password of real persons, B.C., C.H., E.L., J.M., A.P, R.O., T.T., and L.D., employees of Victim-7, during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), that is, conspiracy to commit wire and bank fraud, in violation of 18 U.S.C. § 1349, as charged in Count 1, knowing that the means of identification belonged to another actual person.

All in violation of Title 18, United States Code, Sections 1028A(a) and 2.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## **FORFEITURE ALLEGATION**

2          **38.**     The allegations contained in Counts 1 through 15 of this Indictment are

3   hereby realleged and incorporated by reference for the purpose of alleging forfeitures

4   pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States

5   Code, Section 2461(c).  Upon conviction of any of the offenses charged in Counts 1

6   through 15, the defendant, DENYS IARMAK, shall forfeit to the United States any

7   property, real or personal, which constitutes or is derived from proceeds traceable to such

8   offenses, including but not limited to a judgment for a sum of money representing the

9   property described in this paragraph.

10          **39.**     The allegations contained in Counts 16 through 22 of this Indictment are

11  hereby realleged and incorporated by reference for the purpose of alleging forfeitures

12  pursuant to Title 18, United States Code, Sections 982(a)(2)(B) and 1030(i).  Upon

13  conviction of any of the offenses charged in Counts 16 through 22, the defendant shall

14  forfeit to the United States any property constituting, or derived from, proceeds the

15  defendant obtained, directly or indirectly, as the result of such offenses, and shall also

16  forfeit the defendant's interest in any personal property that was used or intended to be

17  used to commit or to facilitate the commission of such offenses, including but not limited

18  to a judgment for a sum of money representing the property described in this paragraph.

19          **40.**     The allegations contained in Count 23 of this Indictment are hereby

20  realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to

21  Title 18, United States Code, Sections 981(a)(1)(C) and 1029(c)(1)(C), and Title 28,

22  United States Code, Section 2461(c).  Upon conviction of the offense charged in Count

23  23, the defendant shall forfeit to the United States any property, real or personal, which

24  constitutes or is derived from proceeds traceable to such offense, and shall also forfeit

25  any personal property used or intended to be used to commit such offense, including but

26  not limited to a judgment for a sum of money representing the property described in this

27  paragraph.

28

Indictment / *United States v. Iarmak* - 34

*(Substitute Assets)*

41.   If any of the property described above, as a result of any act or omission of the defendant:

     a.    cannot be located upon the exercise of due diligence;

     b.    has been transferred or sold to, or deposited with, a third party;

     c.    has been placed beyond the jurisdiction of the court;

     d.    has been substantially diminished in value; or

     e.    has been commingled with other property which cannot be divided without difficulty,

//

//

//

//

//

//

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  the United States of America shall be entitled to forfeiture of substitute property pursuant

2  to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States

3  Code, Section 2461(c).

4

5                    A TRUE BILL:

6                    DATED:   12/12/19

7

8                    *(Signature of Foreperson redacted pursuant to*
                     *policy of the Judicial Conference)*
                     FOREPERSON

9

10

11 _____

12 THESSA GORMAN
   First Assistant United States Attorney

13 (Acting Under Authority Conferred by 28 U.S.C. § 515)

14

15 _____

16 ANDREW C. FRIEDMAN
   Assistant United States Attorney

17

18 _____

19 FRANCIS FRANZE-NAKAMURA
   Assistant United States Attorney

20

21 _____

22 STEVEN MASADA
   Assistant United States Attorney

23

24

25 _____

26 ANTHONY TEELUCKSINGH
   Trial Attorney

27 Computer Crime and Intellectual Property Section

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970